**COLE SCHOTZ P.C.**
A Professional Corporation
900 Third Avenue, 16th Floor
New York, NY 10022
Laurence May, Esq.
Mark Tsukerman, Esq.
(212) 752-8000 (Phone)
(212) 752-8393 (Fax)
lmay@coleschotz.com
mtsukerman@coleschotz.com

*Counsel for Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 14-70931 (AST) |
| COMMACK HOSPITALITY, LLC, | Chapter 11 |
| Debtor. | |
| In re: | Case No. 15-70166 (AST) |
| ROVER 2004, LLC, | Chapter 11 |
| Debtor. | |

**MOTION OF COMMACK HOSPITALITY, LLC FOR ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY TO RECOVER THE DEPOSIT PROVIDED BY ROVER 2014, LLC UNDER A SALE CONTRACT AND (II) ENJOINING <u>ROVER 2014, LLC FROM INTERFERRING IN CONNECTION THEREWITH</u>**

Commack Hospitality, LLC ("**Commack"**) files this motion (the "**Motion**")[1] for entry of

an order (a) modifying the automatic stay to permit Commack to recover the down payment

provided by Rover 2014, LLC ("**Rover**") under the Sale Contract (defined below) and (b)

---

[1] Unless otherwise noted, any reference to "Debtor" and citation references to "Docket No." refer to Commack and its case, Case No. 14-70931 (AST), as opposed to Rover 2014, LLC and its case, 15-70166.

enjoining Rover from interfering with Commack's efforts to collect the down payment. In support of this Motion, Commack respectfully states as follows:

## PRELIMINARY STATEMENT

1. On November 10, 2014, Commack and Rover executed an Agreement of Purchase and Sale (the "**Sale Contract**"). The Court entered a Confirmation Order (defined below) approving the Sale Contract and authorizing Commack to consummate the sale of its property to Rover. Both the Sale Contract and the Confirmation Order required that the sale close on or before January 15, 2015. Indeed the order expressly withdrew Commack's authority to sell to Rover after that date and the Sale Contract included a time of the essence provision setting January 15, 2015 as the last day to close.

2. Approximately one week to ten days before the 15th of January, Rover notified Commack that it could not close by the 15th, if at all. Rover needed a loan to close the sale and demanded that Commack extend the closing date for about 45 days by which time, according to Rover, it should have found a lender. In response, Commack pointed out, among other things, that: (i) Rover had signed an agreement expressly providing that closing of the sale would not be subject to financing; (ii) Rover agreed to a time of the essence clause which set January 15 as the last day to close; (iii) the Bankruptcy Court had entered an order which stripped Commack of the authority to close after January 15; (iv) about two months had passed since the contract was signed and if Rover needed a loan to close, it should have already secured one; and (v) to induce Commack to execute the Sale Contract, Rover had provided documentation and had represented that it had the funds on hand to close.

3. For a number of reasons, Commack declined to agree to Rover's demand, which would in any event have required it to move this Court for relief from its prior order. Among other reasons, Rover had already made material misrepresentations of fact, it seemed unlikely

that it would be able to secure a loan any time soon, and its breach of the contract had already and would continue to damage Commack.  In an attempt to leverage an extension, Rover threatened to file its own bankruptcy, claiming section 108 of the Bankruptcy Code would give it the additional time that Commack would not.  Rover made good on its threat, but as explained herein, the Rover bankruptcy was filed in bad faith, Rover is not entitled to a section 108 extension, the Court should enforce the agreement it previously approved and the relief requested herein should be granted.

## JURISDICTION

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.    The Plan and Sale Contract**

5.      On March 10, 2014 (the "**Petition Date**"), Commack filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Since the Petition Date, Commack has remained in possession of its assets and the management of its affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has been appointed.

6.      Commack owns real property known as 801 Crooked Hill Road, Brentwood, New York (the "**Property**").  The Property is leased to the Long Island Women's Empowerment Network (the "**LIWEN**") under a triple-net, five-year lease (the "**LIWEN Lease**"), pursuant to which LIWEN operates a temporary shelter for homeless families under contract with Suffolk County.

7. On June 16, 2014, Commack filed its "Second Amended Chapter 11 Plan of Reorganization for Commack Hospitality, LLC "[Docket No. 56] (the "**Second Amended Plan**") and corresponding Disclosure Statement [Docket No. 55] (the "**Second Amended Disclosure Statement**"). The Second Amended Plan was as dual-track plan that contemplated payment in full of all allowed claims against the Debtor's estate by virtue of either (i) a restructuring of Commack's obligations to its secured lender, Stabilis Master Fund III, LLC ("**Stabilis**"), pursuant to the "cramdown" provisions of the Bankruptcy Code and 100% distribution on all allowed claims through periodic monthly payments derived from the revenue generated from the LIWEN Lease (the "**Deferred Payout Track**") or (ii) the sale of the Property and 100% distribution on all allowed claims on the plan's effective date from the proceeds of the sale (the "**Sale Track**").

8. The Court approved the Second Amended Disclosure Statement by Order dated August 8, 2014 (the "**Disclosure Statement Order**") and scheduled a confirmation hearing for October 1, 2014 (the "**Initial Confirmation Hearing**"). In accordance with the Disclosure Statement Order, the Debtor solicited acceptances for the Second Amended Plan, which solicitation materials were premised on confirmation under the Deferred Payout Track absent the materialization of the sale contingency. The Second Amended Plan was rejected by Stabilis, the holder of the Class 1 Secured Claim, and unanimously accepted by all holders of Class II General Unsecured Claims that casted a vote, representing a total aggregate of $1,288,735.07 in general unsecured claims against the estate.

9. The Court treated the Initial Confirmation Hearing as a status conference with respect to the contested confirmation proceedings. As a result of discussions by and among the Court, Commack, Stabilis, LIWEN and other interested parties at and prior to the hearing, the

Debtor agreed to pursue confirmation based on the Sale Track of the Second Amended Plan. The Court adjourned the confirmation hearing to November 12, 2014 (the "**Confirmation Hearing**") to allow the Debtor an opportunity to market the Property, and if a buyer materialized, to enter into a contract of sale. If the Debtor was to proceed with confirmation based on the sale on November 12, 2014, the Court further directed the Debtor to file a notice of the Confirmation Hearing by October 17, 2014, outlining the essential terms of the sale contract.

10. Ultimately, the Debtor agreed to sell the Property to Rover, a newly formed entity represented to be controlled by a Mr. Stephen Werdiger, an individual of substantial worth with liquid assets in excess of $16 million. After significant negotiations, Rover and Commack reached an agreement on the material terms of the sale. As they worked towards a written contract, the Debtor filed and served the requisite notice of Confirmation Hearing, and revised the Second Amended Plan to accommodate a sale to Rover. The sale agreement was ultimately memorialized in the Sale Contract, which was incorporated and implemented by, and subject to confirmation of, the Revised Second Amended Chapter 11 Plan of Reorganization for Commack Hospitality, LLC [Docket No. 114] (the "**Plan**").

11. The Sale Contract provided for the sale of the Property for $15.4 million. Rover agreed to deposit 10% of the Purchase Price (the "**Deposit**") with an agreed escrow agent. Commack insisted and Rover "expressly agree[d] and acknowledge[ed] that [its] obligations to pay the Purchase Price and otherwise consummate the transactions contemplated [by the Sale Contract] [were] not in any way conditioned upon [its] ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise)." (Sale Contract § 2.4.)

12. The closing on the sale was to occur on 10:00 a.m. on the date that was the 15th day following entry of the order confirming the Plan, but in no event earlier than December 15, 2015. Furthermore, the Sale Contract allowed Rover to adjourn the closing date for up to 30 days for any reason through and including January 15, 2015 (the "**Closing Date**"). However, Rover expressly "acknowledg[ed] and agree[d] that on January 15, 2015, **TIME SHALL BE OF THE ESSENCE** with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price and otherwise consummate the transaction contemplated [by the Sale Contract]." (Sale Contract § 3.1 (emphasis in original).)

13. Finally, Sale Contract provided that:

> [i]f Purchaser shall default in the performance of Purchaser's obligations under this Agreement and Seller is ready, willing, and able to Close in accordance with the terms, provisions and conditions of this Agreement and the Closing does not occur as a result thereof . . . , Seller's sole and exclusive remedy shall be, and Seller shall be entitled, to retain the Downpayment as and for full and complete liquidated and agreed damages for Purchaser's Default, and the parties hereto shall be released from any further liability to each other hereunder. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

(Sale Contract § 10.1 (emphasis in original).)

14. The Plan was to go effective after, among other things, entry of a final, non-appealable order confirming the Plan and the closing on the sale of the Property to Rover. (*See* Plan §§ 1.32, 9.2.). On or as soon as reasonably practicable after the Plan's effective date, Commack was to pay all allowed claims in full from the proceeds of the sale, including the undisputed portion of Stabilis' claim.

6

15. On November 10, 2014, Rover executed the Sale Contract and subsequently provided the Debtor with the Deposit.[2] Two days later, at the Confirmation Hearing, the Court confirmed the Plan, and on November 14, 2014, entered the Order Confirming Revised Second Amended Chapter 11 Plan of Reorganization for Commack Hospitality, LLC (the "**Confirmation Order**"). On November 28, 2014, the Confirmation Order became final and non-appealable.

16. The confirmed Plan was predicated on the sale of the Property to Rover. Furthermore, the Confirmation Order expressly required that the sale close on or before January 15, 2015 unless extended by the Court. Paragraph (II)(2) of the Confirmation Order provided:

> The sale to Rover and related transactions set forth in and contemplated by the Plan are hereby approved, subject to the terms of this Order. . . . Notwithstanding anything to the contrary set forth in this Order or the Plan, this Order applies to the sale option in the Plan and requires that *the closing of the sale under the Rover Agreement take place no later than January 15, 2015 unless such date is extended by the Court.* In the event the closing of the sale to Rover does not occur on or before January 15, 2015, this Order shall be deemed vacated, void ab initio and not binding on any creditor or party in interest.

(Confirmation Order (II)(2) (emphasis added).)

### B. Rover's Material Breach and Chapter 11 Filing

17. Rover failed to close on before January 15, 2015 as required by the Sale Contract and the Confirmation Order. Instead of requesting relief from the Confirmation Order, on the Closing Date Rover commenced its own chapter 11 proceedings in this Court which was assigned Case Number 15-70166 (the "**Rover Proceeding**"). The reason giving for

---

[2] The Deposit is being held in an escrow account with Old Republic Insurance Company pursuant to the Sale Contract. Although the Sale Contract called for a Deposit of $1,540,000 (i.e., 10% of the purchase price), Rover only wired $1,520,000 (approximately 9.87% of the purchase price), and failed to provide the missing $20,000 despite Commack's requests. However, Commack agreed to proceed to confirmation of the Plan and consummation of sale despite the discrepancy.

the chapter 11 filing was that Commack "rejected [Rover's] request for a relatively short extension of time of the closing date," (Amended Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-4, dated January 20, 2014 [Rover Docket No. 8] (the "**Tress Declaration**"), at ¶ 11"), and "to gain the benefit of the 60-day toll under 11 U.S.C. Section 108(b) to automatically extend the time of the essence closing date." (*Id.* at ¶ 11.)

18.     On January 28, 2015, Rover filed its schedules and statement of financial affairs in the Rover Proceeding (the "**Rover Schedules**").  According to the Rover Schedules, Rover's only assets were its purported interest in the Sale Contract, the Deposit provided to Commack under the Sale Contract,[3] and $25,000 in a bank account with JPMorgan Chase.  Rover scheduled a total of five creditors, all unsecured, with an aggregate liability of $1,513,100.  Of that amount, (i) $1.5 million is owed to an entity called SWEE LLC, presumably another shell entity controlled by Mr. Werdiger which he used to funnel the Deposit; (ii) $228,000 is owed to USA International Holding LLC, which, upon information and belief, is a real estate broker;[4] (iii) $5,000 is owed to AEI Consultants, (iv) $5,000 is owed to EMJ Construction Consultants, and (v) $3,100 is owed to Riverside Abstract.

## RELIEF REQUESTED

19.     By this Motion, Commack requests that the Court enter an order (a) modifying the automatic stay in the Rover Proceeding to permit Commack to recover the Deposit from the

---

[3] Rover scheduled the deposit as $1,500,000.  In fact, the number is $1,520,000, and Rover is liable for an additional $20,000.

[4] If Rover is indeed liable to pay a broker, it would be another misrepresentation.  In the Sale Contract, Rover and Commack expressly represented and warranted that they had "not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties . . . the negotiation or execution of [the Sale Contract] or the closing of the transaction contemplated [thereby]." (Sale Contract § 12.)

Escrow Agent (defined below) under the Sale Contract and (b) enjoining Rover from interfering with Commack's efforts to collect the Deposit.

## BASIS FOR RELIEF

### A. Commack is Entitled to the Deposit as Provided by the Sale Contract's Liquidated Damages Provision

20. Commack's right to the Deposit under the Sale Contract, as well as more generally the parties' rights and obligations under the Sale Contract, are governed by New York Law. (Sale Contract § 24.2.) As explained below, Commack's right to the Deposit under New York law is beyond dispute.

21. As stated by the New York Court of Appeals, "[w]hen a provision that time is to be of the essence is inserted in a real property contract, the date established as the law day takes on especial significance." *Grace v. Nappa*, 389 N.E.2d 107, 109 (N.Y. 1979). It is black letter law in New York that "'[w]hen there is a declaration that time is of the essence . . . each party must tender performance on law day unless the time for performance is extended by mutual agreement.'" *Parker Hannifin Corp. v. N. Sound Props.*, No. 10 Civ. 6359 (MHD), 2013 WL 1932109, at *6 (S.D.N.Y. May, 8 2013) (quoting *Grace*, 389 N.E.2d at 109). Furthermore, "New York caselaw 'clearly provides that a failure to abide by a time of the essence closing deadline in a sales contract is a material breach of the contract." *Id.* (quoting *In re New Breed Realty Enters., Inc.*, 278 B.R. 314, 325 (Bankr. E.D.N.Y. 2002)); *see id.* at 322 (citing cases)).

22. Thus, even if the parties' agreement "does not provide that failure to close results in a termination of the contract, it is clear under applicable New York law that such failure constitutes a material default that prevents the [defaulting party] from enforcing the [a]greement." *New Breed Realty Enters, Inc.*, 278 B.R. at 323; *see Grace*, 389 N.E. at 109

9

(reasoning that after defendant failed to close when time was of the essence, "plaintiff was well within his rights when he refused to consent to an adjournment of the closing and instead insisted upon immediate performance of defendant's obligations. Once the closing was aborted, moreover, it was not necessary for plaintiff to entertain further proposals from defendant, for if defendant had failed to satisfy a material element of the contract, he was already in default").

23.     Rover's failure to close on or before January 15, 2015, constituted a material breach under New York law, resulting in a termination of the Sale Contract. Furthermore, Rover's breach is not saved by its chapter 11 filing. Putting aside obvious issues of bad faith, Rover's reliance on section 108(b) Bankruptcy Code is clearly misplaced because the time-of-the-essence deadline to close on or before the January 15, 2015 was approved by and mandated by the Court pursuant to its Confirmation Order. By its express terms, section 108(b) of the Bankruptcy Code only applies to deadlines fixed by "applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement,"[5] 11 U.S.C. § 108(b); it does not apply to orders of this Court. Accordingly, the tolling provisions of section 108(b) provide no assistance to Rover.

---

[5] Section 108(b) of the Bankruptcy Code provides:

> Except is provided in subsection (a) of this section, if *applicable nonbankruptcy law*, *an order entered in a nonbankruptcy proceeding*, or *an agreement* fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 60 days after the order for relief.

11 U.S.C. § 108(b) (emphasis added).

24.     A party who has appeared in a bankruptcy case and who has notice of an order entered in that case is bound by the order.  It can not collaterally nullify, amend, modify or vacate the order by claiming that application of section 108 in its case supersedes the order, particularly when the only reason for the filing was to effectively get relief from the order. What Rover should have done was to move for relief from the order in Commack's case which it was free to do under the terms of the Confirmation Order.  Rover deliberately decided not to take this route and we submit that it is now too late for it to reverse course.

25.     Rover's tactics may not be readily apparent, but no doubt it must have concluded that it could not persuade the Court to grant relief in Commack's case.  It would have had to explain, for example, why it represented that it had the funds on hand to close when it did not, why it mislead Commack and other parties in interest (as well as the Court) as to its finances, why it agreed to a time of the essence provision and why it should be absolved of liability for the damages its misrepresentations and delays have cost and will continue to cost Commack.  Why try to answer questions as to which you have no good response if you can avoid the questions in the first place by claiming that section 108 is available in your case and supersedes a valid bankruptcy court order entered in another case ?

26.     Under the express terms of the Sale Contract, Commack's remedy for Rover's default is "to retain the Downpayment as and for full and complete liquidated and agreed damages for Purchaser's Default."  (Sale Contract § 10.1.)  Furthermore, it is a well settled and long-standing rule of New York law that a buyer who defaults on a real estate contract cannot recover the down payment. In *Maxton Builders, Inc. v. Lo Galbo*, 502 N.E.2d 184 (N.Y. 1986) the New York Court of Appeals had occasion to reexamine, and reaffirmed, the long-standing New York rule of *Lawrence v. Miller*, 86 N.Y. 131 (1881) "which permits a vendor on a real

11

estate contract to retain the down payment when the purchaser willfully defaults." *Maxton Builders, Inc.*, 502 N.E.2d at 185. The fact pattern in in *Maxton* was straightforward. Buyers contracted to purchase a newly constructed house from seller and gave the seller a 10% down payment of the purchase price at the contract signing. *Id.* When the buyers sought to cancel the contract based on an alleged failure of a condition, the seller disputed the buyers' right to cancel and sought to collect the down payment. The seller commenced an action recover the down payment, and shortly thereafter, sold the property to another purchaser for the same price. *Id.*

27. The *Maxton* Court affirmed the lower court to hold the seller was entitled to the down payment regardless of what actual damages the seller may or may not have incurred. The court noted that "[f]or more than a century it has been well settled in this State that a vendee who defaults on a real estate contract without lawful excuse, cannot recover the down payment." *Maxton Builders Inc.*, 502 N.E.2d at 186. It reasoned that although "[t]he rule permitting a party in default to seek restitution for part performance has much to commend it in its general applications[,] . . . as applied to real estate down payments approximating 10% it does not appear to offer a better or more workable rule than the long-established 'usage' in this State with respect to the seller's right to retain a down payment upon default." *Id.* at 188-89. To the extent a rule that allowed for consideration of actual damages had merit, the *Maxton* Court reasoned that in the case of real estate contracts, "'stability and adherence to precedent are generally more important than a better or even a 'correct' rule of law,'" *id.* at 188 (quoting *Kramer v. Eckart (In re Eckart)*, 348 N.E.2d 905, 913 (N.Y. 1976)), and declined to adopt a rule that departed from its prior holdings. *Id.* at 188-89. Finally, the court concluded that "real estate contracts are probably the best examples of arm's length transactions. Except in cases

where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of their contract. If parties are dissatisfied with [this rule] the time to say so is at the bargaining table." *Id.* at 189.

28. Thus, under the bright-line rule affirmed by the New York Court of Appeals in *Maxton*, and the express terms of the Sale Contract as approved by this Court, Commack is unequivocally entitled to keep the Deposit as a consequence of Rover's material breach of the Sale Contract. *See Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 307 (E.D.N.Y. 2010) ("Unlike some other jurisdictions, New York maintains the rule that the seller of property may retain the full down payment in the event of the buyer's breach, regardless of whether that sum bears any relation to the seller's expected loss."); *White v. Farrel*, 987 N.E.2d 244, n.2 (N.Y. 2013) ("Because in New York it is 'axiomatic that a vendee who defaults on a real estate contract without lawful excuse cannot recover the down payment . . . it may well be that, in most instances where the buyer breaches a contract to sell real estate, the seller simply retain the down payment without resorting to the expense and uncertainty of litigating actual harm." (internal quotation marks, alternations and citations omitted)); *see, e.g.*, *Hegner v. Reed*, 770 N.Y.S.2d 87, 90-91 (N.Y. App. Div. 2003) (citing *Maxton* and holding that "the sellers were entitled to retain the entire [10%] downpayment as liquidated damages . . . . [T]he sellers' retention of the entire down payment constitutes neither unjust enrichment nor an 'unenforceable penalty.'"); *Ittleson v. Barnett*, 758 N.Y.S.2d 360, 362-63 (N.Y. App. Div. 2003) (retention of ten percent down payment as liquidated damages was warranted under *Maxton Builders* and did not constitute unjust enrichment). Indeed, in the Tress Declaration, even Rover tacitly recognized that Commack is entitled to keep the Deposit absent the grant of a Section 108(b) extension. (*See* Tress Declaration at ¶ 11 ("Because the Debtor is committed

13

to closing, *does not want to forfeit its $1.5 million deposit*, and is reasonably confident it will obtain financing from Sterling Bank, the Debtor is filing this Chapter 11 petition to gain the benefit of the 60-day toll under 11 U.S.C. § 108(b)." (emphasis added).)

### B. The Court Should Grant Commack Relief from the Automatic Stay

29. As noted above, pursuant to the Sale Contract, the Deposit is being held in an escrow account with Old Republic Insurance Company (the "**Escrow Agent**"). The Sale Contract established procedures for the recovery of the Deposit from the Escrow Agent. Generally, in the case of a breach, the Sale Contract requires a party to provide the Escrow Agent with written notice stating its entitlement to the Deposit as a result of termination or cancelation of the Sale Contract or a default in performance of the counter-party's obligations. (*See* Sale Contract § 23.1.3.) The Escrow Agent then delivers the notice to the counter-party who has the right to object to the request within 10 business days of delivery. (*Id.*) If no objection is interposed, the Escrow Agent may deliver the Deposit to the noticing party; if an objection is received, the Escrow Agent may either (i) deliver the Deposit to a court of competent jurisdiction, or (ii) retain the deposit until the occurrence of one of the following events: (a) the non-noticing party fails to commence an action to determine its entitlement to the Deposit within 30 days of receiving the notice, (b) the Escrow Agent is served with an order or judgment entered by a court of competition jurisdiction setting forth the manner in which the Deposit is to be paid out and delivered, or (c) the parties provide the Escrow Agent with a joint statement regarding the disposition of the Deposit. (*Id.*)

30. Commack seeks relief from the automatic stay to collect the Deposit from the Escrow Agent. Section 362(d) of the Bankruptcy Code provides that

14

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

   (A) the debtor does not have an equity in such property; and

   (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).

31. Here, grounds for relief from the automatic stay exist under both sections of Section 362(d). First, it is clear the stay may be lifted under § 362(d)(2) because Rover lacks equity in both the Deposit and the Property, and therefore neither can be used to effect a reorganization. As discussed above, § 108(b) is inapplicable to deadlines imposed by this Court, and Rover's failure to close on the Closing Date as approved and adopted in the Confirmation Order constitutes a material breach, resulting in the termination of the Sale Contract. As a result, under the Sale Contract and applicable New York law, Commack is unequivocally entitled to the Deposit. Furthermore, Rover's material breach cannot be cured through assumption pursuant to Section 365(b) of the Bankruptcy Code because the default is incurable. "A default precludes assumption of an executory contract under § 365 if it is both incurable and 'material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange.'" *In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) (quoting *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990)). As discussed, in the case of a time of the essence sale, a failure to close by the deadline constitutes a material breach that goes to the very essence of the contract under New York law. *See id.* ("[T]he debtor's failure to close on time is incurable and the contract cannot be assumed under § 365."). Thus, neither the Sale Contract nor the Deposit may be used by Rover to effect a

reorganization. *See New Breed Realty Enters., Inc.*, 278 B.R. at 325 (holding that because the debtor's failure to close on a time of the essence sale, "the debtor [was] in material default under the [a]greement, which [could not] be cured, and [could not] assume the [a]greement. Therefore, the debtor does not have any equity in the Property or in the [10%] deposit held in escrow, and they are not necessary to an effective reorganization.").

32. Second, the stay may be lifted pursuant to § 362(d)(1), for cause. It is well established that a debtor's lack of good faith in filing a petition for bankruptcy constitutes cause for relief from the automatic stay. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286-87 (2d Cir. 1990); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001); *In re 234-6 W.22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). The standards for bad faith as evidence of cause to life the stay under § 362(d)(1) or to dismiss a chapter 11 case under § 1112(b) are not substantively different from each other. *See 234-6 W.22nd St. Corp.*, 214 B.R. at 757. The standards for consideration of bad faith filing were set forth in *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997). Among other things, the Second Circuit noted that "[w]hen it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous." *C-TC 9th Ave. P'ship*, 113 F.3d at 1310. Furthermore, the Second Circuit outlined the following facts as indicative of bad faith: (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state

foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees. *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997).

33.     It is plainly evident that Rover did not file its petition in good faith and that cause exists for relief from the stay. The Rover Proceeding was filed solely to avoid the impact of the Confirmation Order in the misguided belief that section 108 would give Rover automatic relief that this Court might not otherwise grant. Rover has no interest in the Property or the Deposit, no chance of reorganization, and at bottom, no *raison d'être*. It is a shell entity, with virtually no assets, no employees and few, if any, legitimate, non-affiliated creditors; as noted, the validity of the few unsecured debts it listed in its Schedules is subject to serious question. Accordingly, Commack submits that cause exists to lift the automatic stay under § 362(d)(1).

## NO PRIOR REQUEST

34.     No previous request for the relief requested herein has been made to this or any other court.

## MOTION PRACTICE

35.     This Motion includes citation to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.

## NOTICE

36.     The Debtor has provided notice of this Motion on: (a) the Office of the United States Trustee; (b) counsel to Rover, (c) counsel to Stabilis, (c) all parties entitled to receive

17

notice pursuant to Bankruptcy Rules 2002. In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) modifying the automatic stay in the Rover Proceeding to permit Commack to recover the Deposit from the Escrow Agent under the Sale Contract (b) enjoining Rover from interfering with Commack's efforts to collect the Deposit, and (c) granting such other or further relief as the Court deems just and proper.

Dated:  New York, New York    Respectfully submitted,
        February 9, 2015

COLE SCHOTZ P.C.

/s/  *Laurence May*
Laurence May, Esq.
Mark Tsukerman, Esq.
900 Third Avenue, 16th Floor
New York, New York  10022
(212) 752-8000 (Phone)
(212) 752-8393 (Fax)