**GOLDBERG WEPRIN**
**FINKEL GOLDSTEIN LLP**
1501 Broadway, 22nd Floor
New York, NY 10036
Kevin J. Nash, Esq.
(212) 301-6944 (Telephone)
(212) 221-6532 (Facsimile)
*Counsel for Rover 2014, LLC*

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT | Hearing Date: |
| EASTERN DISTRICT OF NEW YORK | February 23, 2015 at 10:00 A.M. |

-----------------------------------------------------------x

In re:                                                      Chapter 11

Commack Hospitality, LLC,                   Case No. 14-70931 (AST)

                                    Debtor.
-----------------------------------------------------------x

In re:                                                      Chapter 11

Rover 2014 LLC,                                  Case No. 15-70166 (AST)

                                    Debtor.
-----------------------------------------------------------x

## THE ROVER DEBTOR'S OPPOSITION TO THE MOTION OF COMMACK HOSPITALITY LLC FOR RELIEF FROM THE AUTOMATIC STAY TO RECOVER THE CONTRACT DEPOSIT

**TO THE HONORABLE ALAN S. TRUST**
**UNITED STATES BANKRUPTCY JUDGE:**

The Debtor herein, Rover 2014 LLC (the "Rover Debtor"), as and for its opposition to

the motion of Commack Hospitality LLC (the "Commack Debtor") for relief from the automatic

stay to recover the contract deposit, represents and shows this Court as follows:

### FACTUAL BACKGROUND AND OVERVIEW OF THE ISSUES

1.      It is certainly a rare occurrence for a Bankruptcy Court to decide matters pitting

two of its own bankruptcy estates, but the Commack Debtor's refusal to grant an extension of the

closing - communicated only a little more than an hour before the appointed closing time of 5:00 p.m. on January 15, 2015 - necessitated the second Chapter 11 filing by the Rover Debtor.

2.      On January 15, 2015, at 3:45 p.m., the Rover Debtor filed its own Chapter 11 petition to preserve its rights under the parties Asset Purchase Agreement (the "APA"). The APA provides for the sale of the Commack Debtor's real property at 802 Crooked Hill Road, Brentwood, New York (the "Property") for the sum of $15.4 million with an outside closing date of January 15, 2015.

3.      The parties set a specific time for the closing to coincide with the end of business (5:00 p.m.) on January 15, 2015 pending conclusion of ongoing negotiations which were expected to end successfully. The 5:00 p.m. closing time was confirmed by an e-mail from the Commack Debtor's counsel, Laurence May, issued on January 14, 2015, a copy of which is annexed hereto as **EXHIBIT "A"**.

4.      The Rover Debtor's Chapter 11 filing preceded the time for the actual closing, at 5:00 p.m., preserving the Rover Debtor's rights to close without forfeiture of the deposit.

5.      By virtue of the Chapter 11 filing, the closing was stayed and did not occur. Accordingly, the Rover Debtor was never put in default, nor did the Commack Debtor ever make a full tender in accordance with the seller's closing obligations under the APA. Instead, both sides functionally reserved their rights and the Rover Debtor has continued its pursuit of mortgage financing so as to be in a position to close the transaction.

6.      Negotiations concerning an extension began on or about January 7, 2015, and immediately came to include the Commack Debtor's mortgagee, Stabilis Master Fund III, LLC ("Stabilis"). Although a listing of the specific financial terms of the proposed extension may not be appropriate, it suffices to say that the negotiations included proposals agreeable to the Rover

Debtor for the pre-closing release of the deposit to Stabilis to occur in two stages, plus offers to pay per diem charges so that the Commack Debtor's bankruptcy estate would not incur additional out-of-pocket expenses as a result of the requested extension.

7.    Substantial progress was made during the negotiations, making it all the more disappointing as to how the Commack Debtor handled the events on January 15, 2015. Going into January 15, 2015, the Rover Debtor had every reasonable expectation that a consensual extension would be obtained. However, the Commack Debtor delayed a response to the Commack Debtor's last revised offer, keeping the Rover Debtor in limbo for much of the day on January 15, 2015.

8.    Then suddenly, out of left field, the Commack Debtor demanded a sizeable increase in the purchase price as a condition of the extension. This eleventh hour demand which smacks of a "hold-up," made it clear that the Commack Debtor was no longer bargaining in good faith.

9.    While the Commack Debtor argues that the Rover Debtor's Chapter 11 filing was made in bad faith, what is truly bad faith - and even shameful - was for the Commack Debtor to all of a sudden demand a considerable price increase with the clock literally ticking on a closing. The actions of the Commack Debtor left the Rover Debtor no practical alternative except to seek Chapter 11 relief in an effort to maintain the status quo, while the Rover Debtor sought a more reasonable solution that was fair to all concerned.

10.   It is certainly noteworthy that after months of litigation, the Rover Debtor emerged as the white knight in the Commack Debtor's Chapter 11 case. As of late last year, the Rover Debtor's offer to purchase the Property for $15.4 million was obviously acceptable to the Commack Debtor since it agreed to sell the Property without an auction. Given this favorable

history, there was no legitimate reason for the Rover Debtor to be thrown to the curb merely because it sought an extension of the closing or the Commack Debtor may have flirted with another prospective buyer.

11.     As a matter of substantive law, the Rover Debtor's Chapter 11 filing was made in good faith and constitutes a legitimate exercise of the provisions of 11 U.S.C. §108(b) to protect rights under an expiring contract. Section 108(b) is specifically tailored to situations where a company, such as the Rover Debtor, faces a contractual deadline it cannot meet and requires a brief extension to perform.

12.     The Commack Debtor's argument that 11 U.S.C. §108(b) does not apply because the closing date of January 15, 2015 is also referenced in the Confirmation Order, dated November 14, 2014 approving the sale transaction (the "Confirmation Order") creates an artificial and improper distinction between the Confirmation Order and the APA.

13.     Section 108(b) is written in the disjunctive, meaning that it applies alternatively to deadlines under applicable law, contractual agreements or orders entered in a non-bankruptcy proceeding. The question as to whether a "non-bankruptcy proceeding" within the ambit of §108(b), means the Commack Debtor's case or the Rover Debtor's case is debatable. However, §108(b) applies separately to the APA as an agreement which fixes January 15, 2015 at 5:00 p.m. as the time of performance. Thus, §108(b) has direct relevance to the APA and preserves the Rover Debtor's rights thereunder.

14.     In point of fact, the Commack Debtor is seeking relief from the automatic stay to enforce rights under the APA via the liquidated damages clause and its motion is not aimed at the Confirmation Order. If anything, the Confirmation Order provides that in the event a closing does not occur on or before January 15, 2015, the Confirmation Order "is deemed vacated, void

*ab initio* and not binding on any creditor or party-in-interest". This nullification provision is not addressed by the Commack Debtor in its motion at all, and cannot be eliminated from the analysis.

15.    Because the closing did not occur on or before January 15, 2015, the terms of the Confirmation Order leave the Commack Debtor only with the potential ability to start over if the Rover Debtor does not receive an extension. However, the point to emphasize is that if the Confirmation Order is deemed "void *ab initio*", then, so too, the APA must be deemed "void *ab initio*" as well, because its authorizing order has been vacated. In turn, the Commack Debtor has no entitlement to liquidated damages making stay relief inappropriate.

16.    Adding salt to the wound, any requested price increase does not benefit any of the creditors of the Commack Debtor which will be paid in full under the APA. The request came about only because the Commack Debtor's principal sought to personally profit from the Rover Debtor's request for an accommodation. However, the failure to extend the closing leaves the Property vulnerable to the vagaries of a blind auction sale which will not necessarily generate an equal price, let alone a better price, particularly since LIWEN has already indicated that it will only support the Rover Debtor.

17.    Thus, all things considered, a far better approach is to permit the Rover Debtor a final opportunity to close by March 14, 2015, reimburse the Commack Debtor's estate for any actual out-of-pocket expenses resulting from the extension, and thereby eliminate uncertainty relating to the future of the Property. As noted below in detail, the Rover Debtor feels confident it will be able to close based upon financing from Metropolitan Commercial Bank ("Metropolitan").

18.     Finally, even if arguendo, the Confirmation Order is deemed severable from the APA, there is nothing preventing the Bankruptcy Court from modifying the Confirmation Order at this juncture to provide for a later closing date. As opposed to the APA, the closing date of January 15, 2015 under the Confirmation Order does not carry a time of the essence clause. Therefore, the Bankruptcy Court still has the ability to modify the Confirmation Order in the context of either bankruptcy case to provide for a later closing.

19.     For this reason, the Rover Debtor's Chapter 11 filing should not be seen as an impermissible end run around the Confirmation Order. To the contrary, the Rover Debtor filed this case specifically requesting that it be heard by the same Judge handling the Commack Debtor's bankruptcy knowing that there would have to be some future modification of the Confirmation Order. It is not bad faith to wait and seek appropriate relief after the Rover Debtor's financing stabilized so the Court and all parties have the benefit of a more definitive timeline.

### THE UNANTICIPATED REASONS FOR ROVER DEBTOR'S REQUESTED EXTENSION

20.     While the APA does not contain a mortgage financing contingency it was also well known from the start that the Rover Debtor intended to obtain a certain level of mortgage financing to consummate the sale. The intention of obtaining a mortgage was discussed early on with the Commack Debtor and is duly noted in the APA.

21.     Specifically, paragraph 13A of the APA, provides the Rover Debtor, as purchaser, with the right to "...seek an assignment of the mortgage from Stabilis at purchaser's sole cost and expense in lieu of a satisfaction however the obligation to close shall not be conditioned on obtaining such assignment".

22.    Consistent with many real estate transactions, the fact that the Rover Debtor did not insist on a mortgage contingency, does not mean it did not also intend to utilize mortgage financing for the sale. Indeed, there was no reason to include an assignment of mortgage in the APA, unless the Rover Debtor intended to obtain mortgage financing.

23.    The request for the assignment of the mortgage did not generate any controversy - Stabilis quickly agreed to assign its mortgage to a prospective new lender. While the assignment was not a condition of the sale, it certainly cannot be said that mortgage financing was a foreign concept or somehow was sprung upon the Commack Debtor at the last minute.

24.    The Rover Debtor's prime financial partner, Solomon Werdiger intended to contribute approximately $5.0 - $6.0 million in capital towards the purchase price, and to finance the balance. Contrary to the Commack Debtor's motion, Mr. Werdiger did not misrepresent his financial resources, but there were other considerations that made obtaining a mortgage a preferred course of action. Chief among these considerations is that a significant share of Mr. Werdiger's cash funds is held in an annuity account. Mr. Werdiger learned that a termination of this annuity account carried adverse tax consequences.

25.    This prompted the Rover Debtor to request an extension of the closing after initial efforts to obtain a mortgage loan through Independence Bank were unsuccessful.

26.    Independence Bank declined to proceed because the Property did not fit within its regular portfolio of residential building loans. While the Property has certain residential characteristics, it fundamentally exists as a transient housing facility putting it beyond Independence Bank's core underwriting.

27.     The Debtor learned of Independence Bank's decision in mid-late December, and thereafter sought the extension following the end of the holiday period, while it pursued a new loan application with Sterling Bank.

28.     After the Chapter 11 filing, the Rover Debtor has accelerated its efforts to obtain a mortgage, and is now on the verge of receiving a formal commitment from Metropolitan. Metropolitan issued a term sheet and explanatory letter on February 12, 2015 confirming that it has received an appraisal and has engaged counsel to work towards a March 4, 2015 closing date.   Copies of recent correspondence received from Metropolitan are collectively annexed hereto as **EXHIBIT "B"**.

29.     The Rover Debtor sought a mortgage from Metropolitan instead of Sterling Bank because Metropolitan is more familiar with debtor-in-possession financing and could close without undue anxiety over the pending Chapter 11 cases.   The fact that Metropolitan is now involved should be seen as a positive, and not a sign that the Rover Debtor is all over the place looking for a lender.   According to the latest information, final approval from Metropolitan's credit committee is expected to be received on February 24, 2015.   The Rover Debtor has sought an earlier commitment but Metropolitan's schedule is set for February 24, 2015.

30.     Based on the prospect of obtaining a mortgage from Metropolitan, the Rover Debtor has also renewed negotiations with Stabilis, which is willing to support its  efforts to close within the 60 day period of §108(b) as per the attached  stipulation annexed hereto as **EXHIBIT "C"**. Prior to the return date, the Rover Debtor intends to move to obtain Bankruptcy Court's approval of this stipulation as part of its motion to formally assume the APA under 11 U.S.C. §365.

31.    Moreover, the Rover Debtor presented Stabilis with confirmation that Mr. Werdiger has immediate access to at least $6.0 million of cash funds to help him close. A copy of this confirmation is annexed hereto as **EXHIBIT "D"**.

32.    The other significant stakeholder in the Chapter 11 case, Long Island Woman's Empowerment Network, Inc. (LIWEN") has always been a proponent of the Rover Debtor's efforts to acquire the Property. It is noteworthy that in contemplation of a sale, LIWEN previously entered into an amendment of lease ("Amendment") with the Rover Debtor providing for a long-term extension of LIWEN's occupancy through 2033. A copy of this Amendment is annexed hereto as **EXHIBIT "E"**. The Amendment was given by the Rover Debtor in exchange for an assignment of LIWEN's purchase option which the Rover Debtor also holds pursuant to the attached notice sent to the Commack Debtor without objection last summer, annexed hereto as **EXHIBIT "F"**.

33.    That the Rover Debtor has received the support of LIWEN and Stabilis gives even greater credibility to its Chapter 11 filing.

34.    Although a Chapter 11 was not the preferred route for anyone, it was done in good faith and constitutes a legitimate exercise of rights granted by the Bankruptcy Code. Thus, there is no proper basis to vacate the automatic stay during the 60 day period under 11 U.S.C. §108(b).

## ARGUMENT

## POINT I

### THE CHAPTER 11 FILING IS PROPER AND THE
### ROVER DEBTOR IS ENTITLED TO A SIXTY DAY EXTENSION

35.    The overriding contention that invocation of §108(b) constitutes bad faith finds no actual support in the case law. Indeed, the lift stay motion does not meaningfully address the

relevant authorities and relies on general concepts of bad faith developed out of last-minute efforts to avoid foreclosure.

36.    A proper analysis of good faith relating to §108(b) is far more nuanced, as highlighted by the decision in In re Walden Ridge Development, 292 B.R. 58 (Bankr. N.J. 2003). There, a motion to dismiss a Chapter 11 case for bad faith was denied even though the sole purpose of the filing was to gain additional time to close under a time of the essence real estate contract. The decision in Walden Ridge Development, supra is squarely on point and provides strong support for the bona fides of the Rover Debtor's filing:

> In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors. Here, the Court can find no prejudice to Rizzo nor sufficient circumstances to determine this Petition was filed in bad faith. It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization. Thus, the filing was an appropriate exercise of business judgment and protected the equity of the Debtor in the Purchase Contract for the benefit of other creditors, as well as the Debtor.

Id at 292 B.R. 64.

37.    Besides upholding the filing, the Walden Ridge Development Court also ruled that the Debtor's failure to close constituted a monetary default within the meaning of §365 of the Bankruptcy Code, which could be cured beyond the sixty (60) day period under §108(b). This view has been effectively superseded by the 2005 amendments to §365, but the concepts regarding good faith remain.

38.    Judge Craig confronted a similar issue in New Breed Realty Enterprises, 278 B.R. 314 (Bankr. E.D.N.Y. 2002) but limited a debtor's ability to close under a time of the essence contract to no more than sixty (60) days after bankruptcy. Accordingly, Judge Craig denied a

10

motion to assume the contract which was filed after the sixty (60) day deadline had expired. However, the <u>New Breed Realty</u> Court still recognized that the sixty (60) day extension is a viable tool, and it appears that Judge Craig would have come to the aid of the debtor had the motion been made timely:

> In this case, the debtor's time to tender the additional $300,000 deposit and to close the sale under the Agreement had not expired on the Petition Date. If § 108(b) is applicable, the debtor's time to tender the deposit and close the sale was extended to August 29, 2001 (60 days from the Petition Date). In any event, the debtor failed to cure its defaults within the 60-day period provided under § 108(b). Therefore, § 108(b) provides no assistance to the debtor unless the court grants an extension of time beyond the statutory 60-day period. To the extent that this Court has any authority to extend the cure period under § 108(b), the debtor has not shown that an extension should be granted.

<u>Id</u>. See <u>In re Empire Equities Capital Corp.</u>, 405 B.R. 687 (Bankr. S.D.N.Y. 2009) which brought the <u>New Breed Realty</u> rationale current to incorporate the 2005 amendments to hold that a debtor is only given an additional sixty (60) days to close under a contract if the time to do so expires after the Chapter 11 filing. In this decision, Judge Gropper suggested <u>in dicta</u> that the provisions of §108(b) cannot be invoked by every unscrupulous optionee, while also stating that a bankruptcy case should not be dismissed for bad faith if there is evidence of financial distress. Here, the Rover Debtor is operating under financial distress and faces the prospect of the forfeiture of significant sums.

33.    Moreover, the Rover Debtor has legitimate creditors of its own emanating out of ongoing efforts to close the transaction. Certain funds were borrowed for the deposit and other title and closing related expenses were incurred as well. The broker's commission listed in the petition does not relate to the sale, but was incurred in connection with the Rover Debtor's lease negotiations with LIWEN.

34.    Very often, parties are frustrated by bankruptcy, but this too is not an indicia of bad faith. As the Second Circuit Court of Appeals explained:

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself establish an absence of intent to seek rehabilitation. Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense be "frustrated" when their debtor files a bankruptcy petition. In reality, there is a considerable gap between delaying creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.

In re Cohoes Industrial Terminal Inc., 931 F.2d at 238. (citations omitted). (See In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987) [Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.]

36.    In short, the Commack Debtor has conjured up all types of sinister motives for the filing, when the sole reason is that the Commack Debtor derailed the negotiations on an extension based on an exorbitant last-minute demand.    Accordingly, the Rover Debtor respectfully submits that it should be given a complete sixty (60) day period to close to the BPA consistent with the provisions of §108(b).

## POINT II

### THE LIFT STAY MOTION SHOULD BE DENIED BECAUSE THE COMMACK DEBTOR NEVER MADE A TENDER AND RELEASE OF THE DEPOSIT IS FAR FROM AUTOMATIC

37.    In many respects, the Commack Debtor puts the cart before the horse, in seeking forfeiture of the deposit before a closing occurs. Moreover, the fact that liquidated damages provisions are enforceable in New York does not obviate the need for the Commack Debtor to make an actual tender under New York's complete tender rule.

38.    As a matter of real estate law, before a seller may seek to hold a purchaser in default under a contract, a seller must evidence that it stood ready, willing, and able to perform its contractual obligations. See 1776 Associates Corp. v. Broadway West 57th, 181 A.D.2d 601, 585 N.Y.S.2d 316 (1st Dep't 1992) (no default is established unless the seller makes a tender of performance at a closing and demonstrates it was ready, willing, and able to close); Englehardt v. McGinnis, 2 A.D.3d 572, 769 N.Y.S.2d 297 (2nd Dep't 2003) (summary judgment only warranted where seller demonstrates it is  ready, willing, and able to perform on law day); Madison Investment Inc. v. Cohees Associates, 176 A.D.2d 1021, 574 N.Y.S.2d 980 (3rd Dep't 1991) ("A plaintiff seeking to maintain an action for specific performance or for damages for nonperformance of a contract must demonstrate that a tender of his or her own performance was made.").

39.    "A valid tender requires not only readiness and ability to perform, but actual production of the thing to be delivered." Jamaica Savings Bank v. Sutton, 42 A.D.2d 856, 857, 346 N.Y.S.2d 847, 849 (2nd Dep't 1973).  Where a party claims to have tendered, that party is required to present evidence, in admissible form, that title as required under the parties' contract was actually tendered.  Such evidence generally takes the form of a transcript with the tendered documents annexed.  Pinhas v. Comperchio, 24 Misc.3d 1219(A), 897 N.Y.S.2d 671 (Sup. Ct. Kings Cty. 2006) ("The transcript of the closing clearly shows that a representative of the title company stated that he was prepared to insure the title of the property and that Caruso provided tender by stating 'Mr. Hauser, I'm going to tender those documents . . .'").

40.    In its motion papers, the Commack Debtor makes no mention of its own closing obligations. Its failures in this regard are likely explained by the fact that the parties were in the

13

midst of negotiating an extension of the Closing Date. Nevertheless, the Commack Debtor did not get ready to make a tender and therefore has no immediate right to the deposit.

41.    For example, pursuant to section 6.1 of the APA, no later than two days prior to the Closing Date, the Commack Debtor, as Seller, was required to tender to the Rover Debtor, as Purchaser, a proposed closing statement (the "Closing Statement") containing its best estimate of the amounts of the items requiring adjustment.

42.    In addition, section 3.1 of the APA called for the parties to conduct a "preclosing" on the last business day prior to the Closing Date with title transfer and payment of the Purchase Price to be completed on the Closing Date. Thus, by January 14, 2015, the Commack Debtor was required to prepare and execute, *inter alia*, the following closing documents as set forth under section 8 of the APA:

- An assignment and assumption of leases and security deposits, in the form attached to the Agreement as Exhibit 8.1(b), duly executed by Seller.

- A notice to the Tenants under the Leases advising them of the sale of the Property, duly executed by Seller.

- A consent of the managing member(s) of Seller authorizing the transaction contemplated by the Agreement and the execution and delivery of the documents required to be executed and delivered thereunder.

- A New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 for the conveyance of the Property, duly executed by Seller.

- A New York State Real Property Transfer Report, Form RP-5217NYC, duly executed by Seller.

- A title affidavit reasonably acceptable to Seller and the Escrow Agent.

- To the extent in the possession of Seller, documents expressly relating to the Property, including, without limitation, (a) licenses and permits relating to the Leases or the operation of the Property, (b) certificates, permits and licenses with respect to the Property issued by any governmental authority, (c) current

certifications verifying elevator and boiler inspections, and (d) survey, architectural plans, building plans or specifications pertaining to the Property.

- A completed Form 1099B or other documents required by the Internal Revenue Code of 1986, duly executed and acknowledged by Seller.

- Any other documents required to be delivered by Seller at the Closing pursuant to the provisions of the Agreement or reasonably requested by the Purchaser's title company in connection with the conveyance of the Property.

43.    These omissions are referenced not out of pettiness, but simply to highlight the Commack Debtor's failure to make a complete tender, which is a prerequisite to any right to cause a forfeiture of a deposit under state law.

**WHEREFORE**, for all of the reasons advanced throughout, the Rover Debtor prays for entry of an order denying the Commack Debtor's motion to lift the automatic stay, together with such other and further relief as is just and proper.

Dated:    New York, New York
          February 19, 2015

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____
        Kevin L. Nash, Esq.

x:\gwfg\new data\yen\word\tress, mark - dollar storage - trema.34312\rover 2014 llc\response to commack motion (2-18-15).doc